Earl GRUNWALD, Plaintiff-Appellant,†

v.

COMMUNITY DEVELOPMENT AUTHORITY OF the CITY OF
WEST ALLIS and the City of West Allis, a Municipal
corporation, Defendants-Respondents.

Court of Appeals

*No. 95–2920. Submitted on briefs February 6, 1996.—Decided
May 7, 1996.*

(Also reported in 551 N.W.2d 36.)

†Petition to review denied.

471

For the plaintiff-appellant the cause was submitted on the briefs of *Hugh R. Braun and Jane F. Carrig* of *Godfrey, Braun & Hayes* of Milwaukee.

For the defendants-respondents the cause was submitted on the briefs of *Michael J. Sachen*, city attorney and *Thomas G. Cullen*, assistant city attorney of West Allis.

Before Wedemeyer, P.J., Sullivan and Fine, JJ.

WEDEMEYER, P.J. Earl Grunwald appeals from a judgment dismissing his complaint against the City of West Allis and the Community Development Authority of the City of West Allis (collectively, West Allis). Grunwald owned property located in an area designated by West Allis as the Veterans' Park Redevelopment Area. He challenges West Allis's right to condemn his property under § 66.431, STATS. After the trial court filed its findings of fact and conclusions of law, Grunwald filed a motion for contempt and for appointment of a receiver. Grunwald also appeals from the order denying his motion.

Grunwald contends that the Veterans' Park Redevelopment Area is not a blighted area as defined by

§ 66.431(4)(b), STATS.; therefore, West Allis cannot use eminent domain to acquire his property. He also contends that the taking of his property is not necessary to achieve the objectives of the redevelopment project. Further, he contends that the taking was for a private purpose because West Allis had granted a "right of first refusal" to a private developer. Finally, he argues that West Allis lacked the authority to occupy his property and collect and retain rents while the present action was pending.

We conclude that § 66.431, STATS., is to be liberally construed to remove blight and prevent its reoccurrence and that the trial court's finding that the Veterans' Park Redevelopment Area was a blighted area within the act was not clearly erroneous. We also conclude that West Allis had reasonable grounds for concluding that Grunwald's property was necessary for successful redevelopment of the area. Additionally, the outstanding "right of first refusal" does not make the taking for a private purpose, and Grunwald's challenge to the City's authority to collect and retain rents is moot. Therefore, we affirm the judgment and the order.

## BACKGROUND[1]

Grunwald's property is a one-story commercial building built in 1987 on Greenfield Avenue in West Allis. It is located between South 69th Street and South 70th Street. The building was leased to two tenants under long-term leases. Grunwald acquired the property after its construction.

---

[1] The descriptive information about the Veterans' Park Redevelopment Area, the areas surrounding it, and the redevelopment project is based on trial testimony, exhibits received during the trial, and the trial court's findings of fact.

Pursuant to § 66.431(6)(b)1, STATS., the West Allis Common Council designated the Veterans' Park Redevelopment Area as a blighted area in need of a blight elimination project. The area is approximately 5.4 acres. It encompasses land between South 70th Street and South 68th Street south of Greenfield Avenue to Orchard Avenue, *see* Appendix A, although a forty-two unit apartment building and a veterans' hall, located along South 70th Street, were excluded from the redevelopment plans. Grunwald's property is located approximately in the center of the Greenfield Avenue frontage.

The Veterans' Park Redevelopment Area includes twenty-six parcels of land, containing twenty-eight buildings. The area was platted into lots thirty feet by one hundred to 125 feet. Some parcels contained more than one lot and other parcels were less than a full lot. A few have accessory buildings for adjoining lots. Six of the parcels were vacant. Except for Grunwald's property and the excluded apartment building, the improvements were primarily built between 1900 and 1929. Most were wood-frame buildings, and several were built a minimal distance from the lot lines.

When West Allis began acquisition of the property in the Veterans' Park Redevelopment Area, the area was zoned for commercial and light manufacturing, and residential use was non-conforming. The majority of the buildings were used for single-family, two-family, and multi-family residential properties. Additionally, several buildings had mixed commercial and multi-family uses. In one case, a tavern was combined with apartments and rooms for ten residential units. A feasibility study, dated January 1993, indicated that there were forty-six households and

individual residential units and five businesses in the area.

Properties bordering the Veterans' Park Redevelopment Area on the north and east originally developed as industrial areas. The Allis Chalmers production facilities located north of Greenfield Avenue and East of South 70th Street closed in 1984. In 1986, the facilities were razed. A retail district, the West Allis Towne Centre, was completed on the site in 1987.

The industrial plants east of the Veterans' Park Redevelopment Area were razed beginning in 1985. A retail area, Market Square, and a bank-office building were completed in 1990. Additional retail space was approved for the site but has not been built. The bank-office building faces Greenfield Avenue and South 68th Street. The Market Square development also extends south of the eastern portion of the Veterans' Park Redevelopment Area.

South of the redevelopment district, between Market Square and South 70th Street, is a relatively new forty-eight unit apartment complex. South of the apartment complex is Veteran's Park, from which the redevelopment area takes its name. West Allis completed improvements in the park in 1994.

Finally, West Allis's central business district is located along Greenfield Avenue west of the Veterans' Park Redevelopment Area. There was testimony that West Allis had invested time and money in revitalizing the downtown district. South of the business district and north of Orchard Street are single-family residences and duplexes. Testimony indicated that the residences were built on small lots, apparently creating the rows of older, narrow, two-story homes common in older urban areas.

477

Over the years, the City of West Allis conducted several reviews of the industrial areas and the Veterans' Park Redevelopment Area.[2] In a 1979 update to the City's Master Plan for Land Use, consultants recommended commercial zoning along Greenfield Avenue with high density residential zoning for the remainder of the Veterans' Park Redevelopment Area. The Master Plan recognized that if Allis Chalmers left the city, additional review would be necessary to determine the most appropriate use of its land and the surrounding lands.

Prompted by the Allis Chalmers closure, a comprehensive land use update was prepared in 1987. Although the update did not recommend zoning changes, it recommended development of the Veterans' Park Redevelopment Area as a mixed use planned unit development with small scale retail zoning along Greenfield Avenue and residential zoning for the remainder of the land. In the appendix to the report, the Veterans' Park Redevelopment Area was described as marginal in use and maintenance and a possible target for future redevelopment.

Finally, a feasibility study for redevelopment of the Veterans' Park Redevelopment Area was completed in January 1993. The study identified the area as a blighted area that had a negative image and a negative impact on the surrounding neighborhoods. The feasibility study presented three strategies for the area: code enforcement only, identification of structures capable of preservation with clearance of the others, and total demolition and redevelopment of the

---

[2] The Veterans' Park Redevelopment Area was not designated as such until established by the Common Council in 1993. For convenience, however, this opinion uses this name to refer to the area included within the redevelopment district.

area. If the demolition and redevelopment strategy was pursued, the feasibility study recommended a high-density, multi-family project. The primary factor influencing this recommendation was the concentration of retail and office uses in the surrounding areas. The high vacancy rates in West Allis Towne Centre and Market Square militated against additional commercial development along Greenfield Avenue. Additionally, the new residents attracted to the area by the housing project would support the previously developed commercial areas.

The redevelopment authority recommended, and the Common Council approved, the strategy of total demolition and redevelopment of Veterans' Park Redevelopment Area. When unable to reach an agreement with Grunwald to purchase his property, West Allis commenced condemnation proceedings. West Allis ultimately acquired the property by an award of damages in October 1994. Prior to the award, Grunwald commenced the present action under § 32.06(5), STATS., to challenge West Allis's right to condemn his property. Although Grunwald returned the award of damages as required to continue the present lawsuit, West Allis notified the tenants to pay rent to the City. Relocation of the tenants and demolition of the building were stayed, however, pending a final determination of this lawsuit.

Additional facts will be presented in the discussion of the issues raised by Grunwald.

## STANDARD OF REVIEW

The determination of the necessity of exercising the power of eminent domain to take private lands

pursuant to § 66.431, STATS., is a matter to be determined by the condemning authority. Section 32.07(2), STATS. The invocation of eminent domain is itself an implicit decision that the taking is necessary. *Falkner v. Northern States Power Co.*, 75 Wis. 2d 116, 135, 248 N.W.2d 885, 896 (1977). The condemning authority's decision of necessity is subject to judicial review under § 32.06(5), STATS. Judicial review is limited, however, to determining whether the decision constitutes fraud, bad faith, or a gross abuse of discretion. *Falkner*, 75 Wis. 2d at 132, 248 N.W.2d at 894. If the condemning agency had reasonable grounds for its decision, the decision will be upheld. *Id.* The exercise of the power of eminent domain without statutory authority lacks a reasonable basis. *See Sigma Tau Gamma Fraternity House Corp. v. City of Menomonie*, 93 Wis. 2d 392, 402, 288 N.W.2d 85, 89 (1980).

## IS GRUNWALD'S PROPERTY IN A "BLIGHTED AREA"?

The first issue presented for review is whether the Veterans' Park Redevelopment Area comes within the scope of § 66.431, STATS. Grunwald contends that the area does not meet the definition of a "blighted area" and that West Allis is seeking to use § 66.431, STATS., to illegally condemn property for economic development. If Grunwald is correct, West Allis's decision to condemn his property is unreasonable.

Section 66.431, STATS., is the "Blight Elimination and Slum Clearance Act." Section 66.431(1). In its findings to support the act, the legislature determined that:

> the existence of substandard, deteriorated, slum and blighted areas and blighted properties is a matter of statewide concern

and that

> it is the policy of this state to protect and promote the health, safety, morals and general welfare of the people of the state in which such areas and blighted properties exist by the elimination and prevention of such areas and blighted properties through the utilization of all means appropriate for that purpose, thereby encouraging well-planned, integrated, stable, safe and healthful neighborhoods, the provision of healthful homes, a decent living environment and adequate places for employment of the people of this state and its communities in such areas and blighted properties[.]

Section 66.431(2). The legislature created municipal redevelopment authorities and charged them with the responsibility to prevent and eliminate slums and blighted areas and prevent their reoccurrence. Section 66.431(3)(a). "Blighted area" is defined as follows:

> any area (including a slum area) in which there is a predominance of buildings or improvements, whether residential or nonresidential, which by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation, or open spaces, high density of population and overcrowding, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, or crime, and is detrimental to the public health, safety, morals or welfare, or any area which by reason of the presence of a substantial number of substan-

481

dard, slum, deteriorated or deteriorating structures, predominance of defective or inadequate street layout, faulty lot layout in relation to size, adequacy, accessibility or usefulness, insanitary or unsafe conditions, deterioration of site or other improvements, diversity of ownership, tax or special assessment delinquency exceeding the fair value of the land, defective or unusual conditions of title, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, substantially impairs or arrests the sound growth of a city, retards the provision of housing accommodations or constitutes an economic or social liability and is a menace to the public health, safety, morals, or welfare in its present condition and use, or any area which is predominantly open and which because of obsolete platting, diversity of ownership, deterioration of structures or of site improvements, or otherwise, substantially impairs or arrests the sound growth of the community.

Section 66.431(4)(b).

The Blight Elimination and Slum Clearance Act is a legislative determination that the acquisition, clearance, and redevelopment of blighted areas is a public use. *See David Jeffrey Co. v. City of Milwaukee*, 267 Wis. 559, 578, 66 N.W.2d 362, 373 (1954) (upholding § 66.43, STATS., the Blight Elimination Act). Significantly, the act is directed towards geographic areas and not individual structures; therefore, municipalities may condemn vacant land and sound, conforming buildings that are located in a blighted area. *Id.* at 580, 584-85, 66 N.W.2d at 374, 376-77.

Grunwald argues that the definition of "blighted area" must be strictly construed. He relies on the general rule that because condemnation statutes are in

derogation of the common law, they are to be strictly construed. *See Maxey v. Redevelopment Authority of Racine*, 94 Wis. 2d 375, 399, 288 N.W.2d 794, 805 (1980).

Relying on this strict-construction standard, Grunwald focuses on the individual properties to argue that the Veterans' Park Redevelopment Area is not a blighted area. Grunwald's position is apparent from the testimony of John Raffensperger, an appraiser, who testified on Grunwald's behalf. Raffensperger expressed the opinion that the area was not a blighted area because the individual properties were not blighted. He concluded that while the structures needed varying amounts of maintenance, they were serviceable. He testified that, in his view, blight means conditions making a preponderance of the properties in an area close to unusable or requiring repair well beyond the worth of the property. Grunwald also argues that West Allis failed to present any specific evidence that the incidence of crime, illness, infant mortality, fire, and similar incidents of blighted conditions were high.

West Allis argues that Grunwald's interpretation is too narrow, especially since the statute directs that it is to be construed liberally to effectuate the purposes of the act. *See* § 66.431(17), STATS. Although witnesses for West Allis presented evidence about specific properties, they generally focused on the overall condition of the Veterans' Park Redevelopment Area and the general condition of the properties within the area.

David Weinheimer, the planning and zoning manager for the City, testified that in his professional opinion, the area was blighted. He noted the age of the structures and the problems frequently inherent with seventy to ninety-year-old buildings, including dried

wood and non-compliance with current building codes. Additionally, most structures evidenced varying degrees of exterior deterioration and lack of upkeep. The land use was overly intense (on some lots, buildings covered most of the lot area, eliminating side yards, front setbacks, and off-street parking), street and traffic patterns were outdated, and vacant lots tended to attract refuse and garbage.

Theodore Atkinson, director of the City's Department of Building Inspection and Zoning, testified that the area presented a fire hazard because the wood-frame buildings were built on or close to property lines, allowing a fire to move easily from building to building. He also identified light and ventilation problems where bedrooms opened to adjacent walls. John Stibal, West Allis's Director of Development, testified that the area was experiencing a more dramatic, negative change than other locations in the city. In his opinion, seventy-five percent of the properties were classified as blighted because they were older, deteriorating buildings. There were no requests for building permits, denoting disinvestment in the area. Low-income tenants would not request repairs from landlords or complain about code violations because of fears of rent increases. Additionally, Stibal testified that the redevelopment area presented a very beaten down image at a very visible location, i.e., on an arterial street between the central business district and two major renovations.

The 1993 feasibility study identified inadequate building setbacks and illegally parked vehicles as hampering efforts to collect trash and clear snow. The same conditions potentially impeded access for fire-fighting equipment.

The correct standard to be applied to determine whether an area is blighted presents a question of statutory construction. Construction of a statute presents a question of law, which this court reviews *de novo*. *Hiegel v. LIRC,* 121 Wis. 2d 205, 215, 359 N.W.2d 405, 410 (Ct. App. 1984). Here, the controversy is not over the meaning of the specific words used in the statute but the flexibility in applying the statute to particular conditions.

Grunwald correctly argues that generally eminent domain statutes are strictly construed. This maxim does not apply, however, where the language of the statute clearly, unambiguously, and peremptorily dictates otherwise. *Maxey*, 94 Wis. 2d at 399, 288 N.W.2d at 805. The Blight Elimination and Slum Clearance Act contains a specific direction to construe the statute liberally to effectuate its purposes. Section 66.431(17), STATS. Thus, § 66.431(17) controls, and the statute is to be liberally applied.

The purpose of the act is to eliminate blighted areas and prevent their reoccurrence. Section 66.431(2), STATS. The focus is on geographic areas and not individual properties. A blighted area is an area that, because of certain physical conditions, presents a menace to public health, safety, morals, or welfare; substantially impairs the sound growth of the city or the provision of housing; or constitutes an economic or social liability. The physical conditions that must be present include dilapidated, deteriorating, obsolete, or substandard buildings; inadequate ventilation, light, and open spaces; high-population density and overcrowding; and conditions endangering life or property through fire, crime, or the transmission of disease.

485

In light of the purposes of the act and its direction for liberal construction, we reject Grunwald's proposed standard for determining whether an area is blighted. It is too restrictive to require that a predominance of the buildings be close to unusable or have minimal value and that there be specific evidence of an increased incidence of fire, crime, infant mortality, or illness. Rather, the municipality may focus on the general overall character of the area and its structures and consider the area in the context of its surrounding neighbors.

Here, the trial court found that the non-conforming uses in the Veterans' Park Redevelopment Area adversely affect public health, safety, and welfare and that the non-conforming uses create potential fire safety hazards and unsafe conditions for residents and businesses in the area; construction that is substandard by today's codes results in inadequate ventilation, light, air, and open space; and the building services have not been updated to current codes. The trial court also found that repairs to the buildings over the years have been superficial at best and that fire and structural hazards and defects have intensified as the building continued to age and deteriorate. These findings are sufficient to satisfy a liberal interpretation of the act. Further, our review of the record convinces us that the trial court's findings were supported by the testimony of West Allis's witnesses and by exhibits admitted into evidence. The trial court's findings are not clearly erroneous; therefore, this court cannot set them aside. *See* § 805.17(2), STATS.

## IS TAKING GRUNWALD'S PROPERTY NECESSARY?

West Allis does not claim that Grunwald's property is blighted. It is uncontested that the property is less than ten years old and that it conforms to building codes.[3] At the time West Allis commenced condemnation proceedings, the building was fully leased under long-term leases.

Grunwald contends that his property is not necessary to accomplish the objectives of the redevelopment project. To support this claim, he takes issue with West Allis's redevelopment plan. He questions the feasibility of locating a multi-family residential development along an arterial street. He criticizes West Allis for considering the vacancy rates in the West Allis Towne Centre and in Market Square, without evidence that there would be similar vacancy rates in commercial property fronting Greenfield Avenue in the redevelopment area. He asserts that West Allis failed to present sufficient proof that redevelopment of his property was necessary or that the Greenfield Avenue frontage cannot be used for commercial purposes without jeopardizing redevelopment of the remainder of the redevelopment area for residential use.

■■■■■■

The determination that a particular property is necessary to a redevelopment project undertaken pursuant to § 66.431, STATS., is for the condemning authority. Section 32.07(2), STATS. The role of the courts is not to weigh the evidence and decide if con-

---

[3] Whether the property was in strict compliance with the zoning ordinances is not clear from the record because it lost some parking area when the City acquired ten feet to widen Greenfield Avenue.

demnation is necessary. Rather, the court's role is to decide if the condemning authority's conclusion was based on reasonable grounds and not the result of fraud, bad faith, or a gross abuse of discretion. *Falkner*, 75 Wis. 2d at 132, 248 N.W.2d at 894. Property is necessary if it is reasonably requisite to accomplish the public purpose for which the property is sought.[4] *Id.* If the condemning authority's finding of necessity is supported by evidence, it will not be set aside regardless of the motive for condemning the property. *Sigma Tau Gamma*, 93 Wis. 2d at 409, 288 N.W.2d at 93.

Addressing the need to include Grunwald's property in the Veterans' Park Redevelopment Area, Weinheimer indicated that acquisition of the property was necessary to give any new development of the area frontage and visibility on Greenfield Avenue, to allow

---

[4] The present case is distinguishable from *Mitton v. DOT*, 184 Wis. 2d 738, 516 N.W.2d 709 (1994). In *Mitton*, the Department of Transportation attempted to condemn over six acres for a highway widening project. *Id.* at 739, 516 N.W.2d at 710. Five acres were for a historic preservation site. *Id.* at 740, 516 N.W.2d at 710. The Department lacks statutory authority to condemn property for historical preservation, and it sought to rely on federal statutes to justify the taking of the additional acreage. *Id.* at 740, 744, 516 N.W.2d at 710, 712. The court held that the federal regulations did not require a particular course of action and, after reviewing the record, it concluded that the Department unreasonably attempted to take more property than was necessary for the specific public use of transportation. *Id.* at 747-48, 516 N.W.2d at 713-14. Judicial determination of necessity was proper under § 32.07(3), STATS.

In the present case, however, § 66.431(5)(a)3, STATS., specifically grants West Allis authority to condemn property located in a blighted area, and the authority includes property which is not blighted. Section 32.07(2), STATS., places the determination of necessity with West Allis and not the courts.

for a thirty-foot setback of green space, and to allow the city to vacate South 69th Street. He opined that no developer would be interested in developing the Veterans' Park Redevelopment Area without Grunwald's property because the property would obstruct the image a developer would wish to project to Greenfield Avenue.

This belief was confirmed by Stibal who testified that informal contacts with developers had confirmed a lack of interest in any project that did not include Grunwald's property. Stibal also noted that there was a high vacancy rate in office buildings and retail properties in the city, making commercial frontage unnecessary. Stibal testified that the development department ultimately recommended use of the Veterans' Park Redevelopment Area for senior multi-family housing. This recommendation was based on the various land use studies, including the 1993 feasibility study, and the current conditions in the adjacent redevelopment projects.

We note that the 1979 Master Plan for Land Use had identified a need for housing for the elderly in the eastern part of the City. Additionally, the 1993 feasibility study indicated that the increasing traffic flow on Greenfield Avenue made ingress and egress impractical and unsafe at any area not controlled by a traffic signal. Property abutting Greenfield Avenue should be accessible only through a side street.

Even Raffensperger, Grunwald's expert, acknowledged that it was a matter of opinion whether his plan, which allowed commercial development along Greenfield Avenue, was better than a multi-family development for the entire redevelopment area. He stated that both uses were reasonable.

■

We conclude that West Allis had reasonable grounds for concluding that Grunwald's property was necessary for successful redevelopment of Veterans' Park Redevelopment Area.

Grunwald also argues that the determination that acquisition of his property was necessary to the redevelopment project was a gross abuse of discretion. He relies on the city's issuance of a building permit in 1986, and the building's compliance with zoning and comprehensive use plans until 1991. He also argues that the refusal to exempt his property while exempting two parcels fronting on South 70th Street was also an abuse of discretion. He asserts that neither of the exempted structures conforms to the redevelopment plan.

Charles W. Causcer, the director of planning for HNTB Corp., testified regarding the change in use along Greenfield Avenue. HNTB served as consultant on the Veterans' Park Redevelopment Area for the 1987 and later studies. Causcer indicated that the change from commercial use recommended in the 1987 plan to the 1993 recommendation of multi-family housing reflected the changes in need that had occurred as the other redevelopment projects were completed. The high concentration of commercial development, especially in the West Allis Towne Centre and Market Square, decreased the need for additional commercial units along Greenfield Avenue. This commercial concentration also made a higher-density residential project appropriate.

Causcer's explanation provides a rational basis for the proposed change in use from 1986 to 1993 and defeats Grunwald's claim of a gross abuse of discretion. For a court to hold otherwise would inhibit a munici-

pality's ability to adapt its land use plans to changing circumstances.

Likewise, West Allis offered a reasonable explanation for excluding the South 70th Street parcels and not excluding Grunwald's property. Weinheimer testified that while the veteran's hall was an inconsistent use, it was a small lot in the southwest corner of the redevelopment area and that its demolition would add nothing to the plans. It was a remnant whose omission would not deter the likelihood of redevelopment.

Stibal testified that the two properties were excluded because they were located off to the side and were in sound condition. Further, they were not needed to accomplish the project's objectives. He acknowledged that he tried to avoid demolishing buildings in order to keep the cost of the project lower. Stibal testified that he would have preferred not to acquire Grunwald's property because of the cost involved,[5] but not taking the property would have diminished the possibility of a good development for the project. Again, West Allis had a rational reason for excluding the South 70th Street parcels, and there was no gross abuse of discretion.

## RIGHT OF FIRST REFUSAL

In 1989, NDC, Inc., the developer of Market Square, obtained a right of first refusal to purchase property acquired by West Allis in the Veterans' Park Redevelopment Area on terms and conditions to be determined by West Allis. According to Stibal, the right gave NDC the first opportunity to develop the land for the use and on the terms dictated by West Allis. Stibal

---

[5] Grunwald was awarded $365,000 for the property in the condemnation proceeding.

also testified that NDC would be waiving its right because West Allis proposed a multi-family development in which NDC was not interested.

Condemnation may be invoked only to acquire property for public use. *Schumm v. Milwaukee County*, 258 Wis. 256, 261, 45 N.W.2d 673, 676 (1951). Grunwald mischaracterizes the right of first refusal as committing West Allis to sell all of the acquired land to an identified private developer before the Veterans' Park Redevelopment Area was even established. Based on this mischaracterization, Grunwald argues that the condemnation is for a private, not a public, use.

The statute under which West Allis acted contemplates that acquired land may be redeveloped by private parties. Section 66.431(9), STATS. The short duration of public ownership does not deprive the taking of its public use, and the sale or leasing of the land to private interests is incidental to the act's main purpose. *David Jeffrey Co.*, 267 Wis. at 581-82, 66 N.W.2d at 375. The right of first refusal was subject to West Allis's determination of how the property should be redeveloped; NDC acquired no control over the process. Furthermore, according to the testimony, NDC was waiving its right and would not be acquiring the property. The right of first refusal does not change West Allis's acquisition of Grunwald's property into something not contemplated by § 66.431, STATS. Therefore, West Allis did not condemn the property for private use.

Although West Allis presented significant evidence to support its redevelopment plan, Grunwald also argues that the decision to convert the Greenfield Avenue frontage to multi-family residential property is

492

"illogical, if not irrational." He then goes on to accuse NDC of controlling this decision through its right of first refusal and suggests that NDC was motivated by a desire to preclude additional commercial competition for its own project. Not only does Grunwald fail to show how the right of first refusal could dictate West Allis's decision regarding the proposed use of the property, there is no evidence in the record that NDC had any significant input into West Allis's actions regarding the Veterans' Park Redevelopment Area. The argument is totally without merit.

## WEST ALLIS'S RIGHT TO COLLECT AND RETAIN RENTS

West Allis served the jurisdictional offer for the condemnation of Grunwald's property on Grunwald in August 1994. Grunwald timely commenced the present action to challenge West Allis's right to condemn his property. The condemnation proceeding continued, and an award of damages was made to Grunwald in October 1994. Pursuant to § 32.05(7)(c), STATS., title to the property vested in West Allis when the award of damages was paid and the award was recorded in the office of the register of deeds.

In order to protect his right to challenge the condemnation, Grunwald returned the damages payment to West Allis and obtained an injunction prohibiting West Allis from relocating the building's tenants and razing the building. After the trial court enjoined West Allis from relocating the tenants, West Allis collected and retained the monthly rent for the building. In September 1995, Grunwald filed a motion to find West Allis in contempt for communicating with the tenants about relocation and for the appointment of a receiver

to collect rent during this appeal. The trial court denied his motion.

Grunwald contends that while the present action is pending, West Allis lacks the right to occupy his property and collect rents and to also retain the full amount of the damage award. He represents that this issue has not been considered by an appellate court, and he asks that this court do so regardless of the outcome of his appeal. We decline his invitation. Because of our decision on the merits of this appeal, Grunwald's claim is moot. The condemnation was proper. Grunwald is not entitled to return of his property. Title passed to West Allis in October 1994, and it was entitled to collect rents from that time forward.

*By the Court.*—Judgment and order affirmed.